A. B. Innis v. Commissioner. Jean B. Innis v. Commissioner.
Innis v. Commissioner
Docket Nos. 2735, 2736.
United States Tax Court
1945 Tax Ct. Memo LEXIS 129; 4 T.C.M. (CCH) 729; T.C.M. (RIA) 45246; June 29, 1945
*129 1. Petitioner was a member of a partnership which secured a lease for the purpose of mining gold from certain land in California. The lessors reserved reversionary and other rights of ownership. The royalties paid to lessors were in terms of a percentage of net profits. Held, royalties paid pursuant to the lease agreement were includible in lessors' gross income and excludible from the partnership's gross income. 2. Pursuant to contracts, the partnership paid to an individual for his services in securing the lease, 2 1/2 per cent of its net profits. The partnership also paid 7 1/2 per cent of its net profits to the same individual for the assignment of his option to lease certain other adjacent lands for mining purposes. The partnership is entitled to deduct such amounts from its gross income by way of amortization of the contracts. Associated Patentees, Inc., 4 T.C. 979, followed. Valentine Brookes, Esq., for the petitioners. T. M. Mather, Esq., for the respondent. VAN FOSSAN Memorandum Findings of Fact and Opinion The respondent determined deficiencies of $325.23 and $372.19 in the income taxes of the petitioner A. B. Innis for the years 1938 and 1939, respectively, and deficiencies of $328.23 and $372.08 in the income taxes of the petitioner Jean B. Innis for the same respective years. He also found an overassessment of $59.51 for the year 1940 in favor of each of the petitioners. The following issues are presented: 1. Are amounts paid by the petitioners as sublessees of mining property to the sublessors, based on a percentage of the net operating profits as defined by the lease, excludible from the sublessees' gross income as royalty payments? If they are not, are such payments deductible as ordinary and necessary business expenses? 2. Are amounts paid to an individual by the petitioners for his seices in acquainting them with the property and computed on the operating net profits *131 therefrom, excludible from the petitioners' gross income? 3. Are amounts paid to an individual for the assignment of an option on certain mining property and based on a percentage of the net operating profits therefrom, excludible from the petitioners' gross income? Findings of Fact Certain facts were stipulated. The pertinent portions thereof are as follows: The petitioners are husband and wife and reside in California. They filed their separate income tax returns for the taxable years on a community property basis, with the collector of internal revenue for the northern district of California. The petitioner A. B. Innis will hereinafter be referred to as the petitioner. During the taxable years the petitioner and his father, W. O. Innis, were partners doing business under the name of Penn Dredging Company. Under the partnership agreement the petitioner was entitled to receive 50 per cent of the net profits, computed after the payment of salaries to the partners. In March 1938, the partners entered into an agreement with Reed H. Richards and A. Y. Taylor. In this agreement Richards and Taylor described themselves as "possessors and lessees" of certain lands in Nevada County, *132 California, which the lessees "hired and took" for the purpose of mining gold, etc. They also designated themselves as lessors and the partners as lessees of the property which the partners were given the right to enter upon and mine for gold and other minerals for a period of five years or until the prior removal of all gold and other minerals, profitably recoverable. The parties might abandon the property if, in their opinion, it should be found unprofitable to continue mining. The partners agreed to start operations by April 1, 1938, weather conditions permitting, and also to furnish the sublessors on request a map or plat of operations and of prospecting. The sublessors were permitted to continue their operation until the partners had moved 25,000 yards of gravel and thereafter could remove their equipment or leave it on the ground, as they chose. The partners retained title to, and the right to remove any buildings they erected, and agreed to hold the sublessors free and harmless of all liens and liability arising from operations and to permit no liens to attach to the property. The sublessors retained the right to eject the partners from the premises and to terminate the agreement *133 for failure of the partners to abide by the foregoing covenant, in which event the partners agreed not to remove their equipment until all liens should be removed and all claims paid. The rights acquired by the partners under the agreement were not assignable without the sublessors' consent except by death of a partner. The partners agreed to pay Richards and Taylor 33 1/3 per cent of the net profits from all operations producing an average "clean-up period" yield of less than 50 cents per yard and 40 per cent when such yield should be 50 cents or more per yard. Upon due notice of a breach of the agreement by its lessees, and their failure to remedy their delinquency within a given time, their contractual right would be forfeited and the lessors might take immediate possession of the property without notice. In determining net profits, the cost of operations was deemed to be a maximum of $6,000 per month but, if less than that sum, the actual cost was to be the factor in computing net profits. During the taxable years the partners mined gold on the properties involved in the agreement and made payments pursuant thereto to Richards and Taylor amounting to $21,787.45 in the year 1938 *134 and $33,573.82 in the year 1939. The partners first became acquainted with the property of Richards and Taylor through M. G. Parker, who showed them its location and possible value. In consideration of his services the partners agreed to make payments to Parker pursuant to an agreement dated February 28, 1938. It was customary in the mining business in the region involved for the mine operator to compensate in this fashion the individual who acquainted him with the property. The agreement provided that Parker should receive 2 1/2 per cent of the partners' portion of the net profits, resulting from the mining of the property. In arriving at the net profits, the amounts paid "to the owners of the real properties" as set forth in the Richards and Taylor agreement were first to be deducted, and the computation thereof would be made according to the method stipulated in the Richards and Taylor agreement. Parker acknowledged that he had "no right or interest in said real properties or in the mining enterprise * * * excepting in so far as this agreement provides." The partners also agreed not to "assign or sublet" the Richards and Taylor agreement without recognition of the Parker agreement *135 by the assignees. Under this agreement the partners made to Parker payments of $1,114.37 in the year 1938 and $1,692.37 in the year 1939. M. G. Parker owned an option to lease for mining purposes land called the "Snyder property" which adjoined the property covered by the Richards and Taylor lease. By an agreement dated February 28, 1938, Parker assigned to the partners his interest in an option given to him by Henry J. Snyder, et al., in consideration of the payment to him of 7 1/2 per cent of the net operating profits computed as in the Richards and Taylor agreement. The partners agreed to conform to the conditions of the option, including the payment of $100 per month to the optionors. The partners were required to reassign the property to Parker if they should choose to abandon it at any time, and at the expiration of five years Parker was entitled, if the partners were not then actually mining the property, to reacquire the property from them by repaying them the $2,500 they were required to pay to the optionors. If at that time Parker elected not to reacquire the property, the partners were obligated to pay him the royalties for another five years. Pursuant to this agreement, *136 the partners made payments to M. G. Parker of $939.99 during the year 1938 and $1,608.75 during the year 1939. The record discloses the following additional facts: Upon the initial negotiations, Richards and Taylor desired a royalty of 25 per cent of the gross income from the mine. The partners objected because the percentage was too high and further, because of the difficulty of securing an accurate accounting of the yardage moved. The net income method then was chosen as being more equitable and workable. Richards and Taylor had objected to that method because the operating expenses might exceed the gross income and to meet that objection a maximum operating figure of $6,000 per month was specified in the agreement. To facilitate the computation of the percentages payable under the Parker contracts, the same method of determining the net profits was adopted. After the partners abandoned the mining of the Richards and Taylor properties, Richards and Taylor asked the petitioner's opinion of the advisability of their leasing the ground to someone else. The petitioner advised them not to put any of their own money into such a scheme. In its income tax returns for 1938 and 1939 *137 the partnership deducted the sums of $21,787.45 and $33,573.82, respectively, as representing rents or royalties paid to Richards and Taylor and also the sums of $2,054.36 and $3,301.12 representing the stipulated amounts paid to Parker in those respective years. The amount paid in 1938 ($2,054.36) was composed of $1,114.37 paid to him as a fee for acquainting the partners with the property and of $939.99 paid to him for the assignment of the Snyder option. The amount paid in 1939 ($3,301.12) was composed of $1,692.37 and $1,608.75 for like considerations. The respondent disallowed the deduction of all such amounts on the ground that in computing the distributive net income of the partnership they were not deductible as rents or royalties, or ordinary and necessary expenses under the provisions of section 23 (a) (1) of the Internal Revenue Code. Opinion VAN FOSSAN, Judge: The first issue before us is whether amounts paid by the petitioners, pursuant to the agreement with Richards and Taylor, were capital expenditures or were royalties excludible from their gross income. If not so excludible, were they deductible as ordinary and necessary business expenses? *138 Both the petitioner and the respondent approach the question from the same viewpoint, as expressed in Anderson v. Helvering, 310 U.S. 404, as follows: It is settled that the same basic issue determines both to whom income derived from the production of oil and gas is taxable and to whom a deduction for depletion is allowable. That issue is, who has a capital investment in the oil and gas in place and what is the extent of his interest. The difference in their conclusions arises solely from their respective constructions of the agreement between the partnership and Richards and Taylor. The respondent contends that the amounts paid thereunder represented consideration for the rights acquired by the partners and hence were capital expenditures not excludible from income, while the petitioner's position is that such amounts represented Richards' and Taylor's share of the income from metal in place in which they were entitled to depletion and hence that they were not a part of the partners' income. The basic principle is that if the owner of the property retains an economic interest in such property, he is entitled to depletion thereon and the amounts paid for the use *139 of the property constitute his income and not that of the payer. Palmer v. Bender, 287 U.S. 551. However, if he establishes a relationship of landlord and tenant in which he, as landlord, leases the property to his tenant, the lessee, for its use in exploitation and production of mineral deposits, the tenant lessee receives the proceeds of sale and pays the cost of production, not as a sole owner of the property, but as one of the two parties equally interested in the returns from the property. The analysis of the instrument before us shows unmistakably that it is in the nature of a lease. Richards and Taylor denominate themselves possessors and lessees of the premises covered by the agreement. They also call themselves "lessors" and the partners "lessees" and designate themselves by these terms throughout the agreement. The lessors "lease" to the lessees and the lessees "hire and take" from the lessors the property in Nevada County for the purpose of mining for gold and other precious metals or minerals. The lessees are given the exclusive right, subject to certain exceptions, to enter upon and mine the land. The lessors are allowed to continue their present operations *140 until the lessees shall have moved a certain amount of gravel. Precise provisions involving both the lessors and the lessees are made to cover the "clean-up" process. The lessees may abandon the lease if they deem it unprofitable to continue mining. Other elaborate provisions obviously contemplate the return of the property to Richards and Taylor if specified conditions are not met by the partners. The rights of the partners under the agreement are not assignable without the lessors' consent. Upon breach or default the lessors may retake the property without notice. These features of the agreement are essentially characteristic of a lease and not of a sale. Richards and Taylor retained their capital investment in the gold and other minerals in place, and granted to the partners merely the right to enter upon the land and extract the gold from it. Cf. Helvering v. Elbe Oil Land Development Co., 303 U.S. 372. The profits of the lessors could be obtained only through the operation of the mine and not from any personal obligation from the lessees. Anderson v. Helvering, supra.The case at bar, therefore, is directly governed by the ruling in Commissioner v. Felix Oil Company, 144 Fed. (2d) 276, *141 decided by the Circuit Court of Appeals for the Ninth Circuit, in which this case arises. In the Felix Oil Company case the court had before it the question of whether or not the lessor, under an oil and gas lease which provided for the payment of 50 per cent of the net profits to the lessor, was entitled to deduct percentage depletion. The court accepted the Tax Court's interpretation of the agreement between the taxpayer and the oil company and said: Under the terms of the agreement the taxpayer retained all rights of ownership except those specifically disposed of therein. It retained reversionary rights in the property, and the right of forfelture in the event of the lessee's failure timely to prosecute drilling; also certain rights in fixtures and equipment upon termination of the lease. As stressed by the Tax Court, the instrument gave the lessee the right to explore the land for oil, and in the event oil were found, to operate on the land for the recovery thereof. Said the Court: "Ownership of the oil in place remained in petitioner as owner of the land and did not pass to the lessee before severance." It was thought that the provision for an equal division of the net profits *142 of each paying well "was merely the yardstick adopted by the contracting parties to measure the production acquired by the lessee and the production retained by petitioner as lessor." Further, that the lessee received the proceeds of sale and paid the costs and expenses of production, not as the sole owner of the oil, but as one of two parties equally interested in the production and sale. The land, said the Court, was furnished by the lessor, and the labor, capital, and management by the lessee. The same Court, in Commissioner v. Anna Vickers Crawford, 148 Fed. (2d) 776, followed the Felix Oil Company decision and stated: The Tax Court relied, in part, upon our decision in Commissioner v. Felix Oil Co., 144 F. (2d) 276, in which we decided that such a lessor is entitled to such deductions for the tax years 1938 and 1939 as a part of the "gross income from property" under § 114 (b) (3) of the Revenue Code. This same section is controlling for the tax year 1940. Petitioner's brief and argument in the instant case present the same argument based upon the same authorities, as in the Felix case, save that it cites the recent case of Commissioner v. Kirby *143 Petroleum Co., decided by the Fifth Circuit on March 5, 1945, 148 Fed. (2d) 80, Judge Hutcheson dissenting. In that case the majority opinion states of such a payment of net profits as here reserved that it "is not the payment in kind of royalty oil or its equivalent" and contends that the net profit from the operation and sale of the oil paid to the owner of the land is not part of the gross income the land owner receives from the property. Unless the majority opinion can be distinguished on the ground that in Texas the title to the oil passes to the lessee, whereas in California it remains in the lessor, we are not in accord with its holding. The Supreme Court cases relied upon in the Kirby Petroleum case are all based on the absence of a property interest in the oil property at the time the income from its sale is paid. In Helvering v. O'Donnell, 303 U.S. 370, as here, "The question is whether respondent [taxpayer] had an interest, that is, a capital investment, in the oil and gas in place." It was held that the taxpayer's prior interest was merely that of a stockholder in the corporation owning the oil land and that, as stockholder, he did not have *144 any capital interest in the corporation's property. Hence he was not entitled to depletion on the "one-third of the net profits derived from the development and operation of the properties." In Helvering v. Elbe Oil Land Development Co., 303 U.S. 372, the taxpayer had conveyed all his interest in the oil land. Relying upon the O'Donnell case, the Supreme Court held that the net profits from the operation agreed to be paid after title had passed from the taxpayer were not subject to depletion. In these two cases all the Supreme Court's discussion of capital interest in the oil becomes meaningless if a royalty is not subject to depletion if payable in "net profits" of the operation. Cf. dissent Judge Hutcheson in Kirby case. Applying the principle set forth in the Felix and Crawford cases, we find that Richards and Taylor, the lessors of the property from which the gold was extracted, retained a depletable interest therein and that, therefore, the amounts paid to them as royalty in the taxable years were includible in their gross income and excludible from the gross income of the partnership, composed of the petitioner and his father. See Helvering v. Twin Bell Oil Syndicate, 293 U.S. 312. *145 The respondent seeks to distinguish the facts in the Felix case from those in the case at bar and thus render the decision in that case inoperative here. He emphasizes the alleged fact that there the lessor was the sole owner of the land while here the lessors were owners of only a leasehold. We see no essential difference in the situations. Lynch v. Alworth-Stephens Co., 267 U.S. 364; Palmer v. Bender, 287 U.S. 551. Both owned property subject to lease. Both reserved certain reversionary and other rights. In both cases the lessors derived payment solely from the proceeds of production. Hence the lessors in both cases retained an economic interest in the minerals in place and had depletable rights therein. [1] The further fact in the case at bar that the lessees' rights were not assignable, adds to the force of the petitioner's argument. We conclude, therefore, that our decision is governed by the Felix and Crawford cases and hold that the payments made to Richards and Taylor by the partners were excludible from their gross income. *146 The respondent cites and relies strongly on Quintana Petroleum Co. v. Commissioner, 143 Fed. (2d) 588. The facts in this case. however, differ materially from those in the case at bar. There an oil and gas lease was assinged by the lessee, Gulf Production Company, to Trinity Drillers, Inc., in consideration of one-fourth of the net proceeds from the operation of the wells. By various transactions, all assignments, the taxpayer acquired the interest of Trinity Drillers, Inc. in the lease. The taxpayer then claimed and was allowed a depletion allowance of 27 1/2 per cent and it also claimed a deduction of an amount representing one-fourth of the net proceeds paid to Gulf. In discussing the payment made to Gulf, the court stated that the obligation to do so was a personal covenant, vested no interest in the payee in the oil and gas in place and thus entitled it to no percentage depletion therefor. It also observed: An outright assignment is a sale, not a sublease. Net-profit payments are payments on the purchase price. As capital investments they may not be treated as business expenses or as rentals or as royalties. Since the Quintana case deals solely with an assigned *147 lease and not with a sublease, the inapplicability of its decision to the facts here is apparent. The petitioner contends that the amounts paid to Parker for his services in securing the Richards and Taylor agreement and for his assignment of his option on the Snyder property, are excludible from the partners' gross income on the same ground as that supporting his argument on the first issue. We do not agree. No rights were reserved by Parker comparable to those retained by Richards and Taylor. The sums representing 2 1/2 per cent and 7 1/2 per cent of the partners' net profits from the operations of the Richards and Taylor and the Snyder leases, respectively, were paid to Parker as a continuing capital cost of the contracts, subject to exhaustion or amortization. Normally, such amounts should be spread over the term of a lease. However, in view of their continuing character and the character of the lease and of the minerals as exhaustible assets, the method adopted by the courts in Associated Patentees, Inc., 4 T.C. 979, (see also John A. Nelson Company, 28 B.T.A. 529, affirmed, 75 Fed. (2d) 696, reversed on another point, 296 U.S. 374) *148 is reasonable and equitable and we will follow it here. The partners are entitled to deductions for amortization of the Parker contract for services and of the assignment of his rights to the Snyder option in the amounts paid by them during the taxable years, as set forth in the Findings of Fact. Decisions will be entered under Rule 50. Footnotes
1. See Burnet v. Harmel, 287 U.S. 103; and United States v. Biwabik Mining Co., 247 U.S. 116↩.